**AEROSONIC INSTRUMENT CORPORATION, Plaintiff, v. NuTONE, INC., Defendant.**

Common Pleas Court, Hamilton County.

Nos. A-151745, A-151746, A-151806, A-152117. Decided September 8, 1958.

Alvin Eugene White, for plaintiff.
Milton M. Bloom, Grauman Marks, for defendant.

## OPINION

By LEIS, J.:

These matters are presently before the Court for determination by agreement of the parties.

Four actions have been instituted by the plaintiff corporation. It is sufficient background to state that NuTone, Inc. had a contract with the federal government to supply altimeters and, in an effort to fulfil the requirements of the contract, entered into a contract with plaintiff corporation to furnish employees, services and parts to it. Disagreements as to contract amounts and materials furnished form the bases for the four suits. Defendant corporation contends that a con-

tract of settlement was reached by the parties which bars further proceedings in the actions.

The issue for determination by this Court is succinctly set down in the Stipulation of the Parties and Order Pursuant Thereto, a document endorsed by counsel for both parties and made an order of this Court on December 27, 1957. The issue is thus stated:

"* * * The Court herein without the intervention of a jury will first hear and determine whether the parties hereto entered into a contract settling all of their said differences." (Emphasis added.)

Before proceeding to the factual question of the existence or non-existence of an accord, it is best to define the terms to be employed. It must be borne in mind that "accord" and "satisfaction" are two distinct but related concepts.

"* * * an accord is an agreement for giving and taking a thing in satisfaction of an existing claim or debts; the satisfaction is the actual giving and taking of such thing." 1 O. Jur. 2d 144.

The accord, therefore, is the agreement; the satisfaction is the execution of the agreement. An accord and satisfaction is the compromise of an unliquidated claim, one disputed in good faith. If there is to be an accord and satisfaction, therefor, certain elements are essential. O. Jur. 2d lists four essential elements:

1. A proper subject matter;
2. Competent parties;
3. An assent or meeting of the minds of the parties;
4. A consideration.

At this instant we are not concerned with a complete accord and satisfaction, but are interested in the existence or non-existence of an accord or agreement only.

Was there an accord? To support its contention that there was, NuTone, Inc. presented to the Court four witnesses and fourteen exhibits. In determining whether or not an accord was entered we must first examine the claims of plaintiff corporation and the transactions which took place in regard to these claims. Basically, four claims are involved to which the Court will refer by the following numbers:

Claim No. 1. $11,370.27 for labor furnished by Aerosonic to NuTone and for consultation services, forming the basis for case A-151806.

Claim No. 2. $2263.04 for pinion gears furnished by Aerosonic to NuTone, forming the basis for case 151746.

Claim No. 3. $1596.25 for processing pinions and sectors, forming the basis for case 151745.

Claim No. 4. $10,210.34 for wages of employees furnished by Aerosonic to NuTone forming the basis for case 152117.

There is sharp disagreement between counsel whether or not all four claims were included even in settlement negotiations. As to claims 2 and 3, there can be no doubt that they were the subject of settlement discussions. To deny this would be to contradict the entire record.

Now, as to the inclusion of claim 1 in these negotiations between Attorney Gold for the plaintiff and Attorney Marks for the defendant. The difficulty insofar as it pertains to claim No. 1 is whether this claim

was merely not discussed or was it abandoned. On this point the Court has studied most carefully the testimony of the witnesses and finds from the evidence presented that claim No. 1 was completely abandoned, the effect being that any settlement negotiations would include the extinguishment of claim No. 1. The Court bases its conclusion as to claim No. 1 on the entire evidence from which the Court interprets that defendant corporation in its own mind felt that claim No. 1 was completely without merit and groundless, and that the discussions between the negotiators proceeded on the theory that claim No. 1 was of no real substance and was therefore abandoned and not merely shelved for future discussion. See Record page 40 (Attorney Gold, as on cross-examination)

"Q. Do I understand, Mr. Gold, that Mr. Marks said that he would negotiate with reference to a total of $3,859.29 if you would just abandon and forget about any other claims of Aerosonic against NuTone?

"A. Yes.

"Q. Just so the record is clear, sir, Mr. Marks said to you that he would not negotiate any further with reference to these two claims unless you forget about all other claims of Aerosonic against NuTone, is that right?

"A. That is right."

Record page 87: (Attorney Marks, direct examination)

"A. First the claim of $11,370.27. I told him that both the company and I felt very strongly about that because that matter had been settled a great many months before, oh, roughly, January of that year, and I had been present when Mr. Frank had agreed to the settlement and it was made, settlement was made I think in January of 1954 and from that time until the date of Mr. Frank's letter no invoice had been rendered for that amount. NuTone had considered it wiped out, and inasmuch as under the contract and under the practice any amounts which Mr. Frank asserted a claim were invoiced practically instantly. It was certainly of most compelling significance that no invoice had been received for some ten months on it. **I told him it was just a phony claim to bolster the other and we would have no part of it."** (Emphasis added.)

Record page 93: (Attorney Marks, direct examination)

"A. I said to him that we felt so strongly about this eleven thousand dollar claim which had been settled that we just were not going to discuss seriously a settlement until that claim was abandoned. I said 'All you are doing in this matter is tacking that eleven thousand dollars on thinking we will be more generous on the others because that eleven thousand dollars is hanging over.' I said 'My client knows this is a false claim and I know it. I was there when the claim was settled and Mr. Frank knows it.' And I said 'You tell your client **he has got to drop that claim** because he knows it is completely false and then we will discuss seriously a settlement of the other items.' " (Emphasis added.)

Record page 110: (Attorney Marks, cross-examination)

"A. I didn't say anything about Mr. Gold not discussing it with me. I said the thing has to be dropped. **It wasn't a matter of discussion, it was a matter of dropping it.** I said it was a fraudulent claim, NuTone

knows it is fraudulent and we are not going to have discussions with that in the background." (Emphasis added.)

Record page 117: (Attorney Marks, cross-examination)

"A. That isn't true. I said unless it was dropped, not that we didn't discuss it. I didn't mind discussing it. I objected to the fraudulent claim being asserted and I would not discuss claims which might or might not have some validity when the major claim, which I knew had no validity, hung over the negotiations." (Emphasis added.)

Now as to whether claim No. 4 was included in settlement negotiations Attorney Marks testified on direct examination that claim No. 4 was not mentioned specifically in negotiations. At page 89 of the record there appears the following:

"Q. Would you explain to his Honor so we may follow claim No. 4, which purports to be for the amount of $10,210.34 and which is the subject of A-152117?

"A. Well, I can tell you about it but I cannot explain the genesis of that claim because Mr. Gold and I never discussed it. We discussed what purported to be all the claims of Aerosonic against NuTone and that amount was never mentioned. I had never heard of it. NuTone had never received an invoice for it. Mr. Gold and I were **trying to settle the entire matter** together and that was never mentioned. It was understood that we were trying to adjust all the claims between the parties but there was no mention of that amount. I had never heard of it at that time." (Emphasis added.)

This claim, though not specifically identified in negotiations, was already in existence, and the Court believes that the negotiations of the parties were meant to encompass all existing claim. See Exhibit 10 which reads: "To settle all claims for $2500.00." (Emphasis added.)

Record page 74: (Attorney Gold, examination by Mr. White)

"A. I understood it to be a complete **settlement of all claims** of Aerosonic against NuTone." (Emphasis added.)

Record page 78: (Attorney Gold, examination by Mr. White)

"A. * * * Mr. Frank at that time told me to go ahead with the suit and I told him that I also had ethical considerations involved, **having in my opinion settled all cases in good faith** with opposing counsel and that I did not feel I could ethically file a suit, or I said I would withdraw from the matter and help Mr. Hogan or anybody else in any way." (Emphasis added.)

Record page 96: (Attorney Marks, direct examination)

"Q. But some time before October 15th you did make such an offer, is that right?

"A. Yes.

"Q. Of what amount?

"A. $2,500.00 in full settlement of all claims between the parties, that is if it was to be a full settlement."

Record page 97: (Attorney Marks, direct examination)

"Q. Following the meeting on or about October 15, 1955, Mr. Marks, can you explain to his Honor, was there any conversation between you and Mr. Gold as to what the $2,500.00 included?

"A. It was to include all claims of Aerosonic and Mr. Frank of all types and natures and forms. It was to be a compelte adjustment."

Record page 116: (Attorney Marks, cross-examination)

"A. There was a complete understanding between Mr. Gold and myself that we were settling the whole thing regarding any claims Mr. Frank might make, Mrs. Frank might make or Aerosonic might make. It was clearly understood it was to be a complete settlement."

A study of the evidence discloses that if there was an accord, all four claims are included in that accord.

The Court believes that there was an accord. There was a bona fide agreement entered into by bona fide agents. There is no doubt that Attorney Marks had authority to enter into the agreement and bind NuTone, Inc., as is evidenced by Exhibit 13, a check for $2,500.00 on which defendant corporation is the drawer. Attorney Gold had sufficient authority to bind plaintiff corporation. Attorney Marks believed that he was dealing with the bona fide agent of plaintiff. Plaintiff corporation, by its actions, clothed Attorney Gold with apparent authority to bind itself; moreover, the authority of Attorney Gold was also outlined to him by the corporation. Record page 28: (Witness Frank as on cross-examination)

"Q. You did employ Mr. Gold in October or the first part of November of 1954, to represent Aerosonic in its claims against NuTone, did you not?

"A. That is correct.

"Q. And you furnished Mr. Gold with information to assist him in the representation of your company, Aerosonic, against NuTone, did you not?

"A. Information, yes, records.

"Q. And you authorized Mr. Gold to do all things necessary to represent the interests of Aerosonic, did you not?

"A. That is correct.

"Q. From the initial employment of Mr. Gold some time around the end of October of the first of November of 1954 until around in November of 1955 Mr. Gold reported back to you, as the president of the company, the results of his negotiations with Mr. Marks, who was representing NuTone, did he not?

"A. That is correct.

"Q. And you authorized Mr. Gold on certain occasions to make certain proposals of settlement, or at least to discuss settlement with Mr. Marks, did you not?

"A. That was what we hired Mr. Gold for.

"Q. That is not my question. I will ask the reporter to read the question to you. (Last question read to witness.)

"A. To discuss settlement with Mr. Marks, that is correct.

"Q. And during that period of time Mr. Gold would report back the status of his negotiations, would he not?

"A. Yes.

"Q. And you would authorize Mr. Gold to give Mr. Marks certain information, would you not?

"A. That is correct."

Record page 125: (Witness Frank, direct examination)

"A. We employed Baron Gold to collect these monies that we had coming to us.

"THE COURT: Let me ask you, was Baron Gold authorized to represent and speak for you in these negotiations between the parties?

"A. Yes, sir, he was.

"THE COURT: And you were to be bound by whatever Baron Gold, the results he achieved?

"A. No sir. The problem that arose was the fact that Baron was to represent us and the final decision was to be made by myself or Aerosonic Corporation.

"Q. In other words, for the purpose of clarification, Mr. Gold was authorized to negotiate but final settlement would be determined by you, is that correct?

"A. That is correct."

Attorney Gold conveyed the offer of $2500.00 to plaintiff corporation, which, through its President, advised him to accept it. Acceptance was conveyed to defendant corporation's attorney by letter (Exhibit 10). This acceptance was not qualified by plaintiff's requiring return of the parts as NuTone had throughout negotiations requested that it be relieved of these parts. As further substantiated by paragraph 2 of the letter dated October 17, 1955 (Exhibit 10) plaintiff or its attorney did not construe return of the parts as any qualification of the offer to settle. The reurn of these parts by defendant to Aerosonic appeared to be taken for granted throughout all the discussions.

For the reasons outlined above the Court finds that there was a valid contract to settle based on offer, acceptance and consideration. Sometime afterward, plaintiff corporation refused to comply with the terms of the settlement agreement. Herein lies the second aspect of this proceeding: It is strongly and capably urged that an executory accord is unenforceable.

The word "accord" signifies different meanings in different circumstances.

"The term 'executory accord,' * * * used in its technical sense, * * * (means) an executory bilateral contract by the terms of which a creditor, having a cause of action against his debtor, promises to receive and the debtor promises to give, something other than was originally due, in satisfaction of the claim." 26 Ill., L. R. 22.

In this case we have such an executory accord wherein the breach comes not from the debtor but by the creditor, who after tender of the settlement check by the debtor changed its mind and refused to perform under the settlement contract. The cases which refer to the term "executory accord" arise under varied situations such as the sufficiency of the defense or the granting of specific performance of such an agreement, and they deal with different kinds of claims and breaches by both creditors and debtors. As varied as are the situations, as varied are the decisions. The old concept of the non-enforceability of an executory accord has its roots in English law.

"As early as 1681, the Court of King's Bench suggested that since

this rule was established when 'remedy was not given for mutual promises, which now is given,' the rule should be changed." 1 Minn. L. R. 503, at p. 504.

Now this Court cannot blindly adhere to a principle of non-enforceability of executory accord and say that the accord here has no effect; but it must examine the circumstances as they exist in the instant case and apply pertinent principles thereto.

Firstly, this is neither an action for specific performance of the accord nor is it an action to test the sufficiency of the defense. The cases submitted by counsel have all been carefully studied by the Court, and these cases, along with additionall authorities found by the Court deal mainly with the legal situations enumerated in the preceding sentence. Here, however, by the written stipulation of counsel, this proceeding is limited to "* * * whether the parties hereto entered into a contract settling all of their said differences."

This Court finds that the parties, through duly constituted agents, had a meeting of the minds and did enter a contract settling all their said differences. The agreement was not a unilateral promise but was a valid contract having the sanctity of a contract.

In response, therefore, to the stipulation of the parties and the order pursuant thereto, that the Court determine whether the parties entered into a contract settling all of their said differences, this Court finds that the parties did so enter such a contract.